IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


PEGGY WILSON                                                              PLAINTIFF


VS.                         CASE NO. 3:20CV00100 PSH


ANDREW SAUL,  Commissioner,
        Social Security Administration                          DEFENDANT


ORDER


        Plaintiff Peggy Wilson ("Wilson"), in her appeal of the final decision of the

Commissioner of the Social Security Administration (defendant "Saul") to deny

her claim for Disability Insurance benefits ("DIB") and supplemental security

income ("SSI"), contends the Administrative Law Judge's ("ALJ") determination

that she could perform her past relevant work or, in the alternative, perform other

work in the economy, was not supported by substantial evidence.  More

specifically, Wilson argues that the ALJ erred in her consideration of a Medical

Source Statement provided by her treating medical care providers.  The parties

have ably summarized the medical records and the testimony given at the

administrative hearing conducted on January 30, 2019. (Tr. 24-50). The Court has carefully reviewed the record to determine whether there is substantial evidence in the administrative record to support Saul's decision. 42 U.S.C. § 405(g). The relevant period under consideration is from July 15, 2016, the date of alleged onset, through April 18, 2019, when the ALJ ruled against Wilson.

*The Administrative Hearing:*

At the January 30, 2019, hearing Wilson was 51 years old, and reported she had a ninth grade education. Wilson lived with her husband and last worked as a laundry worker at a nursing home. According to Wilson, her husband did the majority of the cooking and shared in the household shopping duties, while Wilson cleaned the house. Wilson estimated she left the house a "couple times a week" going to the store, the doctor, or her sister's house. (Tr. 31). Wilson stated she drove locally, including the fifteen minute drive to her sister's house. On a typical day, Wilson described staying at her home doing housework. She also described down days when she did not do anything, especially since her daughter's death in May 2018. Her good days included outdoor yard work and chores, but even on the good days she avoided contact with others.

Wilson indicated she could not perform her previous laundry work because it "became overwhelming," citing difficulties dealing with the families of residents

at the nursing home.  (Tr. 32).  Wilson noted troubles staying focused and

completing tasks in the workplace and at home.  When asked by the ALJ if she

could perform a job with no contact with the public and only one task to perform,

Wilson did not rule out such a job – "I guess it would be – depends what the job

was I was doing."  (Tr. 33).

In response to questioning by her attorney, Wilson stressed her trouble

completing tasks.  She noted that her medications, including Seroquel, help

"sometimes" with her focus.  (Tr. 35).  She also indicated gaps in her employment

in 2016 were tied to mental problems.  She also identified voices as a barrier to her

employment – "voices are like controlling loud," "the voices, you know, like

control me.  Really loud and controlling."  (Tr. 44).

Thomas Edward Bott ("Bott"), a vocational expert, testified.  Bott described

Wilson's past employment as a laundry laborer as an unskilled, medium exertional,

SVP 2 job.[1]  The ALJ asked Bott to assume a worker of Wilson's age, education,

and experience, who could perform unskilled work at all exertional levels, perform

simple routine and repetitive tasks that can be performed by rote, make simple

work-related decisions with little judgment, and concentrate, persist, and maintain

---

[1] SVP, or specific vocational preparation, refers to the amount of time it takes to learn a specific job.. SVP 2 jobs require more than a short demonstration of skills and could include up to one month of time to learn the skills.

pace with normal breaks, with incidental interpersonal contact with co-workers and

no contact with the public.  The worker would require simple, direct, and concrete

supervision.  Bott testified such a worker could perform Wilson's past job as a

laundry laborer as that job is typically performed in the national economy.  Bott

acknowledged, however, that Wilson's description of her past job varied from the

typical description of a laundry laborer.  Bott further testified that other jobs

existed in the national economy which such a hypothetical worker could perform.

Bott identified landscape specialist and hospital cleaner as jobs which fit that bill.

Bott opined, however, that no jobs would be available if the hypothetical worker

would miss work or be late for work more than twice a month and would require

frequent unscheduled breaks during the workday.  (Tr. 24-50).

*ALJ's Decision:*

In her April 18, 2019, decision, the ALJ determined Wilson had not engaged

in substantial gainful activity since July 15, 2016, the alleged onset date.  Severe

impairments found by the ALJ were depressive disorder as well as trauma and

stressor-related disorder.  The ALJ noted Wilson's mental impairments did not

meet or medically equal the criteria of Listing 12.04.  The ALJ considered the

"paragraph B" criteria regarding mental impairments, finding Wilson had a mild

limitation in understanding, remembering, or applying information, a moderate

4

limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself.  The ALJ determined Wilson had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she could perform simple, routine, and repetitive tasks (performed by "rote"), make simple work-related decisions requiring little judgment, concentrate, persist, and maintain pace with normal breaks, and have incidental interpersonal contact with co-workers and no work with the public. Also, she required simple, direct, and concrete supervision.  These limitations mirrored those contained in the initial hypothetical question posed to Bott.

The ALJ cited *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and indicated she had given full consideration to all of the factors set forth in that case. She concluded Wilson's subjective statements were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 17). The ALJ reviewed the medical evidence with an emphasis on treatment records during the relevant period. The ALJ also addressed the opinions of treating physician Mary Wegner ("Wegner"), who opined in April 2018 that Wilson had marked and extreme mental limitations which would cause her to be absent from work more than three days per month.  The ALJ gave "little weight" to Wegner's opinions

because other medical records showed Wilson's symptoms improved with medication, and a December 2018 treatment record showed Wilson alert, in no acute distress, and with no symptoms of depression.  (Tr. 18).  Finally, the ALJ noted several cancelled and no-show appointments at Mid-South Health Systems ("Mid-South," where Wegner was employed). The ALJ concluded Wilson was capable of performing her past relevant work as a laundry service worker.  In the alternative, relying upon Bott's expert testimony, the ALJ determined Wilson was capable of performing jobs in the national economy.  Therefore, the ALJ concluded Wilson was not disabled.  (Tr. 7-23).

*Medical Evidence During the Relevant Period:*

Wilson was treated at Mid-South prior to the relevant period, typically being seen by Ken Pruett ("Pruett"), an APRN.  Her first visit after the alleged onset date of July 15, 2016, was in October for a medication check.  Pruett recorded Wilson was no longer employed and was applying for disability benefits.  Wilson stated her mood was "okay, for now."  (Tr. 347).  The diagnosis was major depressive disorder, recurrent episode, and posttraumatic stress disorder ("PTSD"). Pruett indicated Wilson's affect was restricted and she had some occasional suspiciousness, and the plan was to continue on Seroquel with Wilson to return in three months for a med check.  Wilson was encouraged to continue in individual

therapy.  (Tr. 346-350).

Three months later, Wilson reported her mood as "worried," and Pruett found her affect restricted, her thought process logical, and her judgment and insight fair.  (Tr. 355).  The diagnoses were unchanged and the plan, including the encouragement to continue in individual therapy, was unchanged.  (Tr. 353-360).

In March 2017, Wilson returned for a medication check.  Pruett noted Wilson was not employed but "due to financial issues, may have to return part-time."  (Tr. 359).  The diagnoses, medication, and plan were unchanged.  (Tr. 360-365).

Later in March, Wilson was seen at Mid-South by Alex Sprouse ("Sprouse"), LPC, who completed a Treatment Plan.  Sprouse noted Wilson had ongoing restlessness, worry and low mood at times, ongoing hyperactivity, and inattentiveness at times.  He also noted some ongoing problems with focus/concentration.  The plan was consistent with previous treatment.  Wilson was to continue with individual therapy, and the plan was signed by Sprouse, Wilson, and Wegner.  (Tr. 366-373).  Wilson failed to show for scheduled therapy sessions on March 21, June 6, and June 14, 2017.  (Tr. 375).

Wilson returned for a medication check on July 17 and was seen by Pruett, who recorded that Wilson recently quit her job due to stress.  Wilson's subjective

complaints and Pruett's observations were similar to previous visits, although Wilson described her mood as "very worried."  (Tr. 379).  The diagnoses, medication, and plan were unchanged, and Wilson was instructed to return in three months and continue in individual therapy.  (Tr. 377-382).

Wilson cancelled a scheduled appointment in August 2017 because she was out of town, and did not appear for a September 13 appointment.  (Tr. 384-385).

Wilson described her mood as "depressed" when she saw Pruett in October. As with earlier visits, her speech was clear, eye contact good, and judgment and insight were fair.  The diagnoses and plan were unchanged, and Lexapro was added to the previous medications.  (Tr. 386-392). Two weeks later Wilson was again seen by Pruett for a medication check.  She described her mood as "better," and Pruett noted that normal liver function tests allowed her to start Strattera to assist with hyperactivity and focus problems.  The diagnoses and plan continued as before, with Wilson to return in two months.  (Tr. 393-397).

On December 26, 2017, Wilson did not appear for her scheduled appointment.  (Tr. 399).

In February 2018, Wilson informed Pruett she was not doing well with Strattera and it was discontinued.  Wilson said her mood was "not good," and Pruett recorded her affect was restricted, her thought process logical, and her

8

judgment and insight fair.  Wilson was to continue Lexapro and Seroquel,

encouraged to continue with individual therapy, and directed to return in three

months.  (Tr. 405-410).

Wilson returned to Pruett on April 19, 2018.  She reported continued

frustration with a lack of focus and worry.  Pruett rated her speech as clear, eye

contact good, thought process logical, and her judgment and insight as fair.  Pruett

noted some occasional suspiciousness, and further noted Wilson's denial of

hallucinations and delusions.  Wilson was to continue in individual therapy and

return in three months.  Her medications were unchanged.  (Tr. 428-433).

On the same date, Pruett executed a Medical Source Statement - Mental.

Wegner was listed on the form as collaborative physician but it appears the form

was signed only by Pruett.  Pruett rated Wilson's limitations in twenty categories.

A *marked* limitation was defined as one where the individual's ability to function

is limited to a point that would seriously interfere with performance of work

activity.  Pruett found Wilson to have marked limitations in nine of the twenty

categories.[2]  A limitation was *extreme* if there was no useful ability to function in

---

[2] These categories were: (1) ability to understand and remember very short and simple instructions; (2) ability to understand and remember detailed instructions; (3) ability to carry out detailed instructions; (4) ability to maintain attention and concentration for extended periods; (5) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) ability to sustain

this area.  Pruett rated Wilson with extreme limitations in seven categories.[3]  Pruett

found Wilson to have moderate limitations in three areas and to have mild

limitations in the remaining two areas.[4]  Pruett estimated Wilson's impairments

would result in her missing more than three days of work per month.  Diagnoses

listed on the form were major depressive disorder, recurrent, PTSD, and rule out

attention-deficit hyperactivity disorder.  Pruett remarked that Wilson's "focus

follow-through on tasks, and difficulty handing [sic] transitions is unusually poor.

It does not appear that client would be able to handle the stress of maintaining

gainful employment."  (Tr. 415, 413-415).

Wilson saw Pruett for a medication check in May 2018, reporting grief due

---

an ordinary routine without special supervision; (7) ability to interact appropriately
with the general public; (8) ability to ask simple questions or request assistance; and
(9) ability to set realistic goals or make plans independently of others.

[3]

Extreme limitations were found in: (1) ability to remember locations and work-like
procedures; (2) ability to maintain attention and concentration for extended periods;
(3) ability to work in coordination with or proximity to others without being distracted
by them; (4) ability to complete a normal work-day and workweek without
interruptions from psychologically based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods; (5) ability to accept
instructions and respond appropriately to criticism from supervisors; (6) ability to
respond appropriately to changes in the work setting; and (7) ability to travel in
unfamiliar places or use public transportation.

[4]

Although there were twenty categories on the form, there were twenty-one ratings, as
Pruett rated Wilson as having both a marked and an extreme limitation in her ability
to maintain attention and concentration for extended periods.

to the recent death of her daughter.  Pruett described Wilson as very emotional, and encouraged her to continue with therapy.  As with earlier visits, Pruett recorded Wilson's affect was restricted, her thought process logical, and her judgment and insight fair.  Again, Pruett noted some occasional suspiciousness, and further noted Wilson's denial of hallucinations and delusions.  Wilson was to continue in individual therapy, continue with Lexapro and Seroquel, and return in three months.  (Tr. 418-421).

In August 2018, Wilson presented as a new patient to Dr. Stephen Pirtle ("Pirtle"), complaining that her mind races, she sometimes hallucinates, and she was kidnapped by her husband for three days.  Wilson requested medication refills, which Pirtle provided, noting she was "tolerating medication well at current doses without adverse effects."  (Tr. 439).  Pirtle diagnosed depressive disorder and anxiety.  (Tr. 437-440).

Wilson presented at the emergency department of the  Great River Medical Center in December 2018, complaining she had stepped on a nail a day earlier. She was treated and discharged in stable condition.  (Tr. 442-448).

*Did the ALJ err in considering the Medical Source Statement - Mental executed on April 19, 2018:*[5]

---

[5]

The parties quarrel over whether the Medical Source Statement should be attributed

It "is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  The ALJ is not to "defer  or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920a (2017).[6] The ALJ is directed to consider the consistency of all of the medical treatment records and opinions.  "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (2017).

---

primarily to Wegner, the physician, or Pruett, the APRN.  The document itself is signed by Pruett, who saw Wilson on most occasions.  Wegner's name is also listed on the document.  The Court will assume the Medical Source Statement reflects the opinion of both Pruett and Wegner.

[6]

The current regulations contrast with prior law, which provided the opinion of a treating physician merited deference and "is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record." *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003).

This is not an instance where the ALJ failed to acknowledge the opinions in the Medical Source Statement.  Instead, the question before the Court is whether the ALJ placed "permissible weight" on the opinions.  *Lawrence v. Saul*, ___ F.3d ___, 2020 WL 4375088, (8th Cir.) (July 31, 2020).  As previously noted, the ALJ gave "little weight to Dr. Wegner's opinion because medical records show that the claimant's symptoms improved with Lexapro; and on December 20, 2018, medical records from Great River Medical Center show that the claimant was alert and in no acute distress.  The claimant reported no symptoms of depression and denied threats or abuse.  She also had several cancelled and no show appointments" at Mid-South.  (Tr. 18).

The ALJ's explanation for why she assigned little weight to the Medical Source Statement could have been more thorough.  Even so, the Court finds the ALJ's decision in this regard was consistent with the medical treatment records and opinions, and was supported by substantial evidence of record.

Wilson contends the ALJ should not have relied heavily on the treatment records of Great River Medical Center to discount the Medical Source Statement.  Since she was being treated for foot pain, she maintains the notations on her mental status were not as consequential as the treatment notes from Mid-South.  Wilson is correct.  While  the emergency department note is not a persuasive example, the

ALJ did cite to the Mid-South records, which comprise the vast majority of the medical records during the relevant period.  The Court finds, however, that the Mid-South records are inconsistent with the Medical Source Statement.

The Mid-South treatment records do not support a finding of marked and extreme limitations as described in the Medical Source Statement.  While Wilson's mood varied during her visits, including the understandable grief following her daughter's death and the improvement attributed to Lexapro, the treatment notes consistently portray a patient dealing with depression and PTSD with medication and therapy, but not a severely impaired individual.  Wilson was seen regularly but not on a frequent basis, typically visiting every three months.  Her medication regimen was altered very little during the relevant period.  In the treatment notes, Wilson was consistently observed to be neatly dressed, cordial in demeanor, with clear speech and good eye contact, logical thoughts, no hallucinations or delusions,[7] and fair judgment and insight.  (Tr. 317-318, 323-324, 335, 342, 347-348, 354-355, 361, 378-379, 388, 394-395).

The ALJ cited Wilson's failure to appear for appointments as a factor in her

---

[7] Wilson's testimony that she hears voices that control her is not reflected in the Mid-South treatment notes during the relevant period.  Wilson did report hallucinations to Pirtle, though not controlling voices, in August 2018.

14

decision.  This was not error.  Not only is failure to seek treatment a relevant factor, it is more significant in this instance where the providers opine Wilson is disabled but do not mention her failure to keep her appointments in the Medical Source Statement.[8]  *See Owen v. Astrue*, 551 F.3rd 392 (8th Cir. 2008).

In summary, the checklist Medical Source Statement is at odds with the more thorough treatment records of Mid-South.  Additionally, when a treating source provides a checklist form, as Pruett/Wegner did, the opinion's value is lessened because it consists of conclusions rather than findings tied to clinical or diagnostic data.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).   Mid-South's treatment notes did not mention the limitations contained in the Medical Source Statement.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (limitations in physician's medical source statement unmentioned in records of treatment).[9]  Furthermore, the treatment records more closely mirror Wilson's testimony and

---

[8]

The records typically provide no reason for Wilson failing to keep her appointments. In February 2018, Wilson did report that she did not keep an appointment because "she has been doing pretty well."  (Tr. 435).

[9]

The limitations found in the April 2018 Medical Source Statement were not noted in July 2016, when Wilson indicated she was seeking disability benefits, or in March 2017, when she stated she may be returning to part-time work.

reports, as well as the opinions of the state agency physicians.[10]

The Court notes that the ALJ did not find Wilson was without limitations. To the contrary, the RFC contained numerous nonexertional limitations, all of which were related to the simplicity of the work and the type and extent of contact with others.  The limitations account for problems Wilson identified at the hearing, where she stated her last job was overwhelming due to difficulty dealing with the families of the nursing home residents.  Wilson did not rule out her ability to perform a simple job  with no contact with the public.  (Tr. 33).  The jobs identified by Bott, as well as the job previously performed by Wilson, corresponded with the RFC assessed by the ALJ.

For these reasons, substantial evidence supports the ALJ's consideration of the Medical Source Statement from Pruett/Wegner and the determinations reached by the ALJ.  The Court notes that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion.  The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  This test is amply

---

[10]

State agency physicians Laurie Clemens and Don Johnson opined Wilson could perform unskilled work with incidental interpersonal contact, where complexity of tasks is learned and performed by rote, with few variables and little judgment, and with simple, direct, and concrete supervision.  (Tr. 64, 97).

satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Saul is affirmed

and Wilson's complaint is dismissed with prejudice.

IT IS SO ORDERED this 2nd day of December, 2020.

_____
UNITED STATES MAGISTRATE JUDGE